UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

JOANNE M. MECKLEY,                  :
                                    :
            Plaintiff               :    No. 4:08-CV-1552
                                    :
       vs.                          :    (Complaint Filed 8/19/08)
                                    :
MICHAEL J. ASTRUE,                  :
COMMISSIONER OF SOCIAL              :    (Judge Muir)
SECURITY,                           :
                                    :
            Defendant               :

**ORDER**
February 11, 2009

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Joanne M. Meckley's claim for social security
disability insurance benefits.

        Disability insurance benefits are paid to an individual
if that individual is disabled and is "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  The
parties are in agreement that December 31, 1997, was the date that
Meckley was last insured.  In order to establish entitlement to
disability insurance benefits Meckley must establish a disability
on or before that date.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20
C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244
(3d Cir. 1990).

Meckley, who was born on August 2, 1950, claims that she became disabled on November 25, 1996, because of fibromyalgia, degenerative disc disease, and arthritis.  Tr. 128.[1]  Also, in documents filed with the Social Security Administration on July 11, 1999, and September 28, 2000, Meckley claimed that she was seeing a psychiatrist for panic attacks and was suffering from depression.  Tr. 130 and 154-157.[2]  At the time of the onset of her alleged disability which was the last day she worked, Meckley was employed as a home health care aide.  Tr. 137 and 142.[3]  She also had worked as a nurse's aide, waitress and a sewing machine operator.  Tr. 137-139.  The nurse's aide position is considered medium exertional work[4] and the waitress and sewing machine

---

1.   References to "Tr.___" are to pages of the administrative record filed by the Defendant on October 27, 2008, and December 23, 2008.

2.   The psychiatrist was Eric D. Becker, M.D.  Tr. 341-342.

3.   Meckley contends in her brief that the last day she worked was November 25, 1996.  The Defendant did not challenge this assertion and we will accept it as true. However, earning records indicate that Meckley worked for VNA of Eastern Pennsylvania, Inc., in 1996 earning a total of $11568.36 and that she worked for the same company in 1997 earning $59.25.  Tr. 117.

4.   Medium work is described at 20 C.F.R. § 404.1567 as follows:

> Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

operator positions are considered light exertional work.[5]  Tr.
837.

On August 14, 1998, Meckley protectively filed an
application for disability insurance benefits.  Tr. 123.[6]  After
her claim was denied initially and upon reconsideration, a hearing
was held on June 28, 2000, before an administrative law judge.
Tr. 565-571.  After that hearing the case was remanded to the
state agency for further consideration of Meckley's mental
disorders.  The state agency further developed the record and on
May 3, 2001, again denied Meckley's claim.  Meckley then requested
another administrative hearing.  On May 2, 2003, a second hearing
was held before an administrative law judge.  Tr. 572-604.  On May

---

5.  Light work is described at 20 C.F.R. § 404.1567 as follows:

> Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects
> weighing up to 10 pounds.  Even though the weight
> lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or
> when it involves sitting most of the time with some
> pushing and pulling of arm or leg controls.  To be
> considered capable of performing a full or wide range
> of light work, you must have the ability to do
> substantially all of these activities.  If someone can
> do light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting
> factors such as loss of fine dexterity or inability to
> sit for long periods of time.

6.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.  Meckley signed the application on July 10,
1999.  Tr. 91-93.

29, 2003, the administrative law judge issued a decision denying Meckley's application for benefits. Tr. 636-641.  Meckley filed a request for review of the decision with the Appeals Council of the Social Security Administration. Tr. 651.  On March 16, 2005, the Appeals Council concluded that there was no basis upon which to grant Meckley's request for review. Tr. 652-654.

Meckley then filed an action in this court.  <u>Meckley v. Barnhart</u>, Civil No. 3:CV-05-1031 (M.D.Pa.).  The case was assigned to the Honorable Christopher C. Conner and referred to Magistrate Judge Blewitt for preliminary consideration.  On April 12, 2006, Magistrate Judge Blewitt issued a report rejecting Meckley's claims that the administrative law judge erred in failing to discuss Meckley's alleged impairment of fibromyalgia, finding that Meckley's mental impairments were not severe during the period under review, and  finding Meckley not fully credible regarding her limitations.  Magistrate Judge Blewitt did find that the administrative law judge's discussion of Meckley's mental residual functional capacity (RFC) was inadequate and recommended that the case be remanded for further proceedings.  Specifically, Magistrate Judge Blewitt stated as follows:

> Here, it appears that the ALJ focused only on the Plaintiff's physical impairments when determining the Plaintiff's RFC.  The ALJ relied on the physical RFC assessment from Dr. Hill and on the Plaintiff's description of the physical demands of her past relevant work in a factory in determining Plaintiff's RFC.  While the ALJ did mention earlier in his decision that while the Plaintiff's mental impairments resulted in no

4

> "more than slight functional limitations" during
> the period under review, the ALJ did not discuss
> what those limitations were.

Tr. 669 (citations to the prior administrative record omitted).
No objections were filed to the report of Magistrate Judge Blewitt
and on May 11, 2006, Judge Conner adopted the report of Magistrate
Judge Blewitt in toto and remanded the case to the Commissioner
for further proceedings. Tr. 673.

In accordance with Judge Conner's order adopting
Magistrate Judge Blewitt's report and remanding the case for
further proceedings, the Appeals Council on December 9, 2006,
vacated the Commissioner's decision relating to Meckley's
disability insurance benefits claim and remanded the case to the
administrative law judge for further proceedings consistent with
Judge Conner's order. Tr. 713-714.  A hearing was then held before
an administrative law judge on March 13, 2007, at which Meckley
and a vocational expert testified.  Tr. 803-843.  Thereafter, on
May 23, 2007, the administrative law judge issued a decision
finding that Meckley had not proven that her impairments prevented
her from performing a range of unskilled sedentary work on or
before December 31, 1997. Tr. 844-858.  On June 23, 2007, Meckley
requested that the Appeals Council review the administrative law
judge's decision and on June 20, 2008, the Appeals Council found
no basis to grant review. Tr. 605-613.  Thus, the administrative

law judge's decision of May 23, 2007, stood as the final decision of the Commissioner.

On August 19, 2008, Meckley filed a complaint in this court requesting that we reverse the decision of the Commissioner denying her disability benefits.  The Clerk of Court assigned responsibility for this case to the undersigned.

The Commissioner filed an answer to the complaint and a copy of the administrative record on October 27, 2008.  On December 23, 2008, the Commissioner supplemented the administrative record with a document that was inadvertently omitted from the initial submission.  In accordance with the Local Rules of Court, Meckley filed her brief on December 15, 2008, and the Commissioner filed his brief on January 23, 2009.  The appeal[7] became ripe for disposition on February 9, 2009, when Meckley elected not to file a reply brief.

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is

---

7.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight

7

of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

8

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual

---

8.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

9.  If the claimant does not have a severe impairment or combination of impairments, the claimant is not disabled and the sequential evaluation proceeds no further.

10.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled.  If not, the sequential evaluation process
(continued...)

functional capacity to return to his or her past work and (5) if
not, whether he or she can perform other work in the national
economy. Id.  As part of step four the administrative law judge
must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum
remaining ability to do sustained work activities in an ordinary
work setting on a regular and continuing basis.  See Social
Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  The
residual functional capacity assessment must include a discussion
of the individual's abilities.  Id; 20 C.F.R. § 404.1545;
Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is
defined as that which an individual is still able to do despite
the limitations caused by his or her impairment(s).").

In this case the administrative law judge at step one
found that Meckley had not engaged in substantial gainful activity
from November 25, 1996, through her date last insured of December
31, 1997.  Tr. 847.

At step two, the administrative law judge found that
Meckley had the following medically determinable severe
impairments: degenerative disc disease and depression. Tr. 847.
The administrative law judge found that although Meckley had been
diagnosed with fibromyalgia and arthritis those impairments were

10.  (...continued)
proceeds to the next step.

11.  If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

not diagnosed until 1998 after Meckley's date last insured.  Tr. 847.[12]

At step three, the administrative law judge found that Meckley's impairments did not individually or in combination meet or equal a listed impairment.  Tr. 847.

At step four, the administrative law judge found that Meckley from November 25, 1996 through December 31, 1997, could not perform her past relevant work as a nurse's aid, waitress and sewing machine operator but that she had the residual functional capacity to perform the exertional demands of a limited range of sedentary work.[13]  Tr. 856-857.

The administrative law judge limited Meckley to lifting or carrying 10 pounds frequently and occasionally, standing or walking up to 2 hours in an 8-hour workday and sitting up to 6 hours in an 8-hour workday with a sit/stand option.  The

_____

12.  This conclusion is consistent with Magistrate Judge Blewitt's report which was adopted in toto by Judge Conner.  Tr. 664-666.

13.  Sedentary work is described at 20 C.F.R. § 404.1567 as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

administrative law judge directed that Meckley would only be required to occasionally climb, balance or stoop and would never be required to climb ladders, kneel, crouch, crawl or engage in bilateral overhead reaching.  The work would have to allow for the avoidance of temperature extremes, humidity, vibration and hazards, and be limited to simple routine, repetitive tasks.  Also, the work would have to be low stress, defined as no decision making required and no changes in the work setting.

In light of these limitations, the administrative law judge took testimony from a vocational expert to determine whether or not jobs existed in the national economy for an individual of Meckley's age, education, work experience and residual functional capacity.  The vocational expert testified that Meckley could not perform her past work, but could perform the unskilled, sedentary jobs of an assembler, hand packer and visual inspector. and that there were significant numbers of such jobs in the regional and local economies.  Tr. 857.  The administrative law judge concluded that based on Meckley's residual functional capacity she was not disabled at any time from November 25, 2006, through December 31, 1997.  Tr. 857.

We have thoroughly reviewed the administrative record and for the reasons outlined below have concluded that the decision of the administrative law judge at step five of the sequential evaluation process is not supported by substantial evidence.  There was an error committed during the administrative hearing which requires a remand for a limited purpose as will be explained in this order.  We, however, find no fault with the administrative law judge's rulings relating to steps one through four of the sequential evaluation process.

The administrative record reveals that Meckley was forty-seven years of age at the time her insured status expired on December 31, 1997, and was considered a younger individual under the Social Security regulations.  Tr. 123, 685 and 856.  Meckley has an eighth grade education and, as previously stated, work experience as a nurse's aide, waitress, and sewing machine operator.  Tr. 129, 137-144, 686 and 856.  She commenced working at a very young age.  687.[14]   Earning records from the Social Security Administration indicate that she had employment in 1969, 1970, 1972 to sometime in 1991, 1995, 1996 and 1997.  Tr. 112-113.

Meckley allegedly injured her back in January 1991, while working at Leader Nursing Home when she attempted to lift "a number of fairly heavy patients."  Tr. 303. She complained of pain in the right side of her back, which radiated into her upper

---

14.  She testified that she commenced working as a waitress at age 15.

thighs.  Tr. 303.  Lawrence J. Goren, M.D., examined Meckley on January 9, 1991, and found that Meckley's injury was a moderately severe lumbar strain. Tr. 303.  He advised Meckley to take a few days off work and then return to work.  Tr. 303.  Dr. Goren again saw Meckley on January 29, 1991.  Tr. 301.  Dr. Goren's report of that appointment states in pertinent part as follows:

> I saw Joanne George[15] in my office today January 29, 1991.  Joanne decided not to return to work and states . . . she will never return to work at Leader Nursing Home.  She will never lift any patients anymore, because she knows her back will hurt her and she knows in fact she is not healed.
>
> She did not return to seek our care even during the time that she decided to stay out of work because she said her back only hurt her on the weekend and I was not around on the weekend when her back pain started. She says that people in her family and her boyfriend saw her back swell.
>
> Based on today's examination the patient is healed. She complains of pain only over the right S1 joint and complains of pain and ache down both legs when this pain hits her, and again, it hits her only on the weekends.  Her examination today reveals full range of motion at the waist.  She moves fluidly about the room.  She has no paraspinal spasm.  She has mild tenderness over the right S1 joint.  She has no spasm, tenderness, or tightness over the hip rotator or flexors.  Her straight leg raising exam is negative.  Her hamstrings are loose and not tight.  She has no weakness over either lower extremity.  Her reflexes are equal and symmetric. She has no decrease in sensation.
>
> Compared to her examination on the 9th when she had absolutely incontrovertible soft tissue findings, her examination has normalized and she has healed.  I told

---

15.  Meckley was married to Robert Meckley on July 1, 1994. Tr. 91.  She was previously married to Robert George on September 5, 1972.  The marriage to Robert George ended in divorce in 1990. Tr. 91.

> her she could absolutely return to work at Leader
> Nursing Home.

Tr. 301.

On October 14, 1991, Meckley was seen for the first time by William W. Kulik, D.O.  Tr. 295.   We found no contemporaneous notes from that appointment in the administrative record. However, in a  letter dated December 9, 1991, to Robert W. Mauthe, M.D., Medical Director, Physical Medicine and Rehabilitation Department, St. Luke's Hospital, Bethlehem, Pennsylvania, Dr. Kulik reviews his October 14, 1991, physical examination of Meckley.  Tr. 297.  Dr. Kulik's impression of Meckley on October 14, 1991, as reviewed in his December 9, 1991, letter was as follows:

> It appears that this patient has a chronic soft tissue
> injury superimposed over a mildly L5-S1 degenerative
> disc.  While symptoms of sciatic pain and bilateral
> parathesias are indicative of sciatic nerve irritation
> I am concerned about a lumbosacral facet syndrome being
> the underlying cause of her chronic symptoms.

Tr. 298.  Dr. Kulik had previously referred Meckley to Dr. Mauthe who had examined Meckley on November 5, 1991.  Tr. 299.  In his report of that examination Dr. Mauthe stated in pertinent part as follows:

> Ms. George is a 41 year old female, complaining
> of low back pain, since an injury on 1/9/91. . . .
> Since that time, the patient has undergone multiple
> diagnostic studies, including MRI and x-rays, all
> of which have failed to reveal the etiology of her
> pain. . . .
>
> PHYSICAL EXAMINATION: There is no muscular atrophy or
> trophic skin changes in the lower extremities.  Straight

leg raising and dural stretch test are negative.  Motor
and sensory examinations were normal.

NCS:[16] Bilateral seral nerves demonstrated normal distal
latencies, normal amplitudes and normal conduction
velocity.  Right tibial nerve demonstrated normal
distal motor latency, normal amplitude and normal
conduction velocity.

SPECIAL STUDIES: Right tibial F-wave was normal.
Bilateral H-reflexes were normal and symmetrical.

EMG:[17] EMG examination using presterilized monopolar
disposable electrode of the right tensor fascia lata,
tibialis anterior and gastrocnemius revealed normal
insertional activity and no spontaneous activity.
VMUAP's are normal in morphology.

    Lumbosacral paraspinal muscles were then extensively
sampled and revealed normal insertional activity, no
spontaneous activity.

IMPRESSION: Normal study.

    There is no electrodiagnostic evidence of
radiculopathy, myopathy or peripheral polyneuropathy
at this time.

Tr. 299-300.

    On December 9, 1991, Meckley had an appointment with Dr.

Mauthe.  Tr. 267-268.  In a letter of December 10, 1991, to  Dr.

Kulik, Dr. Mauthe reviewed his December 9th examination findings.

Tr. 267-268 and 294.  Dr. Mauthe's letter of December 10, 1991,

states in pertinent part as follows:

    On physical examination range of motion of the spine
    is normal in flexion, extension, right and left lateral
    bending.  She is able to squat and arise from a squat
    without difficulty.  Straight leg raising is negative
    for radicular pain.  Muscle testing reveals no weakness.

---

16.  "NCS" is an abbreviation for nerve conduction studies.

17.  "EMG" is an abbreviation for electromyography.

Sensory testing reveals some slight subjective hypoesthesia on the lateral border of the right leg and the right foot.  Her reflexes are symmetrical at the knee and ankle.  The patient was able to demonstrate all her exercises without difficulty, climb on and off the examining table, dress and undress without difficulty.  Muscle palpation exam reveals no specific areas of tenderness although there is a diffuse area of tenderness at the lumbosacral junction in the mid back.

Ms. George presents a challenging case.  She has not worked since January 9, 199[1], and is now approaching one year of disability. Statistics show when a patient has been off of work this long there is less than 5% chance that they will return to work.  She is receiving chiropractic therapy three times a week in your office.  She is taking no medications other than those prescribed to her for her nervous condition such as Ativan, etc.

My current diagnosis is degenerative spine disease.

Tr. 267-268.

On December 16, 1991, Dr. Kulik, who as noted above was providing chiropractic treatments to Meckley, sent a letter to Dr. Mauthe.  Tr. 294.  That letter states in pertinent part as follows:

Because there is a legal issue involved, the patient has asked that I briefly summarize her condition . . . . I believe that this patient's pain assessment is permanent, and is due to lumbosacral facet syndrome and a chronic recurrent lumbar strain and sprain.  On x-ray, the narrowed L5-S1 disc was most likely pre-existing, Because of this, the facet joints could no longer fit together perfectly, and began to override each other.  This condition became symptomatic only after the sudden injury to the secondary support mechanism (muscle & ligaments) of the lumbar spine, due to lifting and twisting an excessive weight. Whereas these overriding facets initially presented a predisposing factor to low back pain or injury, they now remain as a formidable perpetuating factor, resulting in acute exacerbations of pain when subjected to unequal loading stresses.

17

Tr. 294.

On or about January 8, 1992, Meckley had an appointment with Jonathan P. Quevedo, M.D., at Good Shepherd Rehabilitation Hospital, Allentown, Pennsylvania.  Tr. 291-293.  During that appointment Meckley denied any radiation of pain into the lower extremities. Tr. 291.  Dr. Quevedo's physical examination revealed that Meckley had a normal gait and was able to ambulate on toes and on heels.  Tr. 292. Dr. Quevedo's impression was that Meckley had chronic work associated back pain with "evidence of more myofascial, ligamentous involvement."  Tr. 292.

At an appointment on April 29, 1992, Meckley complained of "more problems now with back pain from when she was last seen" and Dr. Quevedo found that Meckley had a normal gait, some tenderness at the L5/S1 region "with referred pain toward buttocks and hip."  Tr. 290.  Dr. Quevedo's impression was as follows: "Patient with chronic low back pain, unclear as to why it has increased other than being on less medication and trying to increase her activity.  Feel patient still needs help with regard to pacing and body mechanics."  Tr. 290.

At an appointment with Dr. Quevedo on June 17, 1992, Meckley reported "that she noted some improvement; however, back pain appears to be worse today for some unknown reason."  Tr. 288. Dr. Quevedo's impression was as follows: "Patient with definite improvements on examination after trigger point injections and that areas of tenderness previously have dramatically improved.

18

Patient generally reports improvement in back pain with day to day fluctuations.  Patient does show more evidence of L5-S1 interspinous ligament involvement vs. deeper structures."  Tr. 288.

At an appointment with Dr. Quevedo on July 1, 1992, Meckley reported that her condition had "significantly improved." Tr. 286.  Dr. Quevedo's physical examination revealed Meckley no longer had significant tenderness in the midline L5-S1 interspinous ligament.  Tr. 286.  Dr. Quevedo's impression was that Meckley had "low back pain of mechanical, musculoskeletal origin, minimal right PSIS[18] tenderness, no left PSIS tenderness" and that she was "neurologically intact, although she does complain of numbness below the mid-tibial region, distally bilaterally."  Tr. 286.

At an appointment with Dr. Quevedo on August 25, 1992, Meckley complained that on August 8th "without any known precipitating factor . . . she had increased low back pain." tr. 285.  Dr. Quevedo's physical examination revealed "trigger points and tenderness just medial to the right PSIS region and below the S1 level midline spine" and his impression was "chronic low back pain."   Tr. 285.

In April 1993, Meckley had an appointment with Dr. Quevedo for complaints of severe back pain.  Tr. 265.  Dr.

---

18.  From a review of the medical records we discern that "PSIS" is an abbreviation used by Dr. Quevedo for paraspinal interspinous.

Quevedo's physical examination revealed that Meckley's gait was "somewhat guarded and antalgic."  Tr. 265.  However, "[m]anual muscle testing of lower extremities" was "grossly intact" and her reflexes were normal and sensation was grossly intact.  She did have tenderness on palpation at the midline of L5-S1 and just below S1 and "tenderness at the right PSIS region with exquisite tenderness just medial to the right PSIS region."  Tr. 265.  Dr. Quevedo's impression was "[q]uestionalble twisting movement in bed which patient reports might have occurred . . .  and aggravated back pain with additional sprain."  Tr. 265.  Dr. Quevedo injected Meckley with Celestone and Marcaine at the tender area and Meckley reported decreased pain after the injection.  Tr. 265.

        A review of the administrative record reveals that Meckley instituted Worker's Compensation proceedings against Leader Nursing Home.  Tr. 94-106.  Several of Meckley's treating physicians were deposed during the Worker's Compensation proceedings.  Tr. 98.[19]  On June 17, 1993, a stipulation was entered into by Meckley and Leader Nursing Home resolving the Worker's Compensation case for a lump sum of $30,000.  Tr. 101-106.  As part of the settlement, the parties agreed that "any psychological/psychiatric or emotional disability [was] not

_____

19.  Drs. Kulik and Quevedo were deposed and were listed as witnesses for Meckley. Drs. Kulik and Mauthe issued reports which were listed as exhibits for Meckley. Tr. 98. The treatment notes from Dr. Goren dated January 9 and 29, 1991, were listed as exhibits for Leader Nursing Home.  Tr. 98.

causally related to the injury which occurred on January 9, 1991."
Tr. 102.

On September 2, 1992, Meckley was seen by Jon Bjorson,
M.D., Associate Professor, Thomas Jefferson University, for an
independent psychiatric evaluation to determine, inter alia,
whether Meckley suffered psychological harm as a result of the
January, 1991, injury. Tr. 269-284.  A report of that evaluation
dated September 9, 1992, states in pertinent part as follows:

> Psychiatric Diagnosis:
>
> Mixed Personality Disorder with Histrionic, Dependent
> and Passive Aggressive Features.
>
> Comments, Findings and Recommendations:
>
>   On careful review of all the information available
> regarding Joanne George, it appears that indeed she did
> have a minor soft tissue injury to her lumbosacral spine
> superimposed on chronic degenerative arthritis of the
> spine, with some disc bulging without radiculopathy.
> Such conditions, needless to say, are not uncommon
> in the general population (including the undersigned).
> Joanne has had longstanding psychological difficulties.
> She was raised in an exceptionally dysfunctional
> family . . . She was involved in a 20 year traumatic
> marriage . . .  She was described as typically
> co-dependent by a social worker at St. Lukes Hospital,
> began to seek help, essentially an acting-out form of
> defiance with a suicide gesture in 1988.  That initiated
> the first of five psychiatric hospitalizations, three
> of which have been for suicide attempts or gestures.
> The probability that these were gestures appears
> clear in view of the fact that the suicide attempts
> were not successful but mainly because they were not
> accompanied by symptoms of profound depression.  It
> also appears that these suicide attempts and
> hospitalizations[20] were indeed a cry for help or
> attention.

---

20.   Each of Meckley's hospitalizations for psychiatric problems
were no more than 2 weeks in duration.  Tr. 239, 245 and 532.

*     *     *     *     *     *     *     *     *     *     *

   From a psychiatric standpoint, Joanne definitely and unequivocally is not disabled at this time.  She is friendly, affable, reasonable, goal directed with good range of affect.  I found no significant evidence of depression except for occasional tears allegedly due to pain, though as indicated there is marked hysterical functional overlay.

*     *     *     *     *     *     *     *     *     *     *

   With regard to her personality disorder, this disorder is not the result of the back injury and is not aggravated by the back injury.  This is a pre-existing condition which is lifelong, which tends to result in inflexible, maladaptive traits which continue throughout most of adult life, impair patterns of perceiving, relating to and thinking about the environment and oneself (direct quote from DSM III-R).  In this particular case, it appears that we have a very insecure young woman who has been extremely dependent on others, especially an abusive husband.  Break up of her marriage and presumably an attempt at renewed relationship with her father did exacerbate feelings of helplessness and hopelessness.  No doubt she was somewhat depressed, though I can not be sure if this was clinically significant.  It did result in acting out.

   With a reasonable degree of medical certainty, Joanne George does not have a significant psychiatric condition resulting from her injury of 1-9-91.

*     *     *     *     *     *     *     *     *     *     *

   With a reasonable degree of medical certainty, at no time, excluding possibly the periods when she was in a hospital, has Ms. George had a psychiatric condition causing vocational or occupational disability.

Tr. 282-284.

   The bulk of the medical records contained within the administrative record relate to Meckley's contact with medical providers after December 31, 1997.  Tr. 182-189, 191-214, 260-263, 255-257, 320-322, 331-492, 500-501, 526-531, and 534-563.  Because

22

Meckley has to prove that she was suffering from a disability on or before December 31, 1997, the records of contact with medical providers after that date have limited relevance[21] to the issue of whether Meckley was suffering from a disability on or before December 31, 1997.  Of particular importance is the fact that no medical provider who actually treated or evaluated Meckley after or prior to December 31, 1997, has stated that Meckley was unable to engage in the exertional and mental demands of sedentary work on or before December 31, 1997.

The administrative record does not reveal that Meckley underwent significant medical treatment from the alleged disability onset date (November 25, 1996) through December 31, 1997, the date last insured.  More importantly, there is no indication that the medical conditions for which Meckley was treated during this period would have prevented Meckley from performing the exertional and mental activities described by the administrative law judge in the residual functional capacity assessment.  Tr. 218-226 and 848.

We will now consider Meckley's arguments set forth in her appellate brief.

Meckley citing <u>Newel v. Comm'r of Soc. Sec.</u>, 347 F.3d 541 (3d Cir. 2003) first argues that the administrative law judge

---

21.  We recognize that medical records that post-date Meckley's date last insured (December 31, 1997) can be relevant if it is possible to infer from them that Meckley had a disabling medical condition that existed on or before December 31, 1997.

"was under the mistaken impression that medical evidence needed to establish contemporaneously with the claimant's alleged time period [November 25, 1996 through December 31, 1997] that the symptoms described were indeed disabling." Doc. 11, Plaintiff's Brief, page 9. This argument is devoid of merit. Unlike the administrative law judge in <u>Newel</u>, the administrative law judge in the present case did not rely on a lack of treatment before Meckley's date last insured. Rather, the administrative law judge thoroughly reviewed the evidence relating to medical evaluations and treatment of Meckley both before and after the date last insured. Tr. 849–856. The administrative law judge did not err in the manner in which he evaluated and considered the medical evidence. There was no failure on the part of the administrative law judge to consider and evaluate non-contemporaneous medical evidence. As noted earlier in this order, Meckley had the burden of proving that she was disabled on or before December 31, 1997. The Commissioner only has a limited burden of demonstrating that other work exists in significant numbers in the national economy which Meckley can do given her residual functional capacity, age, education and work experience. 20 C.F.R. §§ 404.1512(g) and 404.1560(c).[22]

Meckley next claims that the administrative law judge failed to give proper weight to the opinion of the vocational

_____

22. As will be discussed <u>infra</u> this is the step where the administrative law judge erred.

expert, when the vocational expert responded to the most
restrictive hypothetical question.  At the hearing on March 13,
2007, the administrative law judge asked the vocational expert if
there were jobs that could be performed by an individual of
Meckley's age, education, past relevant work experience and
residual functional capacity.  The residual functional capacity as
noted earlier in this order was a limited range of sedentary work
where Meckley would have a sit/stand option and only occasionally
climb, balance and stoop; no climbing of ladders, kneeling,
crouching or crawling; limited bilateral overhead reaching;
avoidance of temperature extremes, humidity, vibration and
hazards; and limited to simple, routine tasks with low stress,
defined as no decision-making and no changes in the work setting.
The vocational expert in response to the administrative law
judge's hypothetical replied that Meckley could perform jobs such
as basic assembly and hand packing.  Tr. 838-839.  The
administrative law judge then asked the vocational expert the same
hypothetical question but added additional restriction, i.e., the
need to take in excess of the normal two breaks per day, more than
three absences per month and off task 40 percent of the time. Tr.
839.  Although the administrative law judge asked the question, as
the trier of fact she did not have to accept the additional
restrictions or the vocational expert's answer to the hypothetical
question.  The administrative law judge found based on her review
of the medical evidence that Meckley's statements concerning her

exertional and mental limitations were not entirely credible.  Tr.
850855.  There was evidence in the record which suggested that
Meckley could perform light work.  Tr. 855.  However, the
administrative law judge gave Meckley the benefit of the doubt and
concluded that her residual functional capacity was a limited
range of sedentary work.  Tr. 855.  The administrative law judge
did not have to accept the additional restrictions which would
have resulted in a finding of disability.

Meckley next argues that she was so limited prior to her
date last insured that the residual functional capacity found by
the administrative law judge supports only a finding that she is
disabled.  Meckley relies on Social Security Ruling 96-9p which
provides in pertinent part as follows:

> Mental limitations or restrictions: A substantial
> loss of ability to meet any one of several basic
> work-related activities on a sustained basis (i.e.,
> 8 hours a day, 5 days a week, or an equivalent
> work schedule), will substantially erode the
> unskilled sedentary occupational base and would
> justify a finding of disability.  These mental
> activities are generally required by a competitive,
> remunerative, unskilled work:
>
> - Understanding, remembering, and carrying out
>   simple instructions.
>
> - Making judgments that are commensurate with the
>   functions of unskilled work – i.e., simple
>   work-related decisions.
>
> - Responding appropriately to supervision,
>   co-workers and usual work situations.
>
> - Dealing with changes in a routine work setting.
>
> A less than substantial loss of ability to perform any
> of the above basic work activities may or may not

26

> significantly erode the unskilled sedentary
> occupational base.  The individual's remaining
> capacities must be assessed and a judgment made as
> to their effects on the unskilled occupational base
> considering the other vocational factors of age,
> education, and work experience.  When an individual
> has been found to have a limited ability in one or
> more of these basic work activities, it may be useful
> to consult a vocational resource.

Meckley focuses on two restrictions imposed by the administrative

law judge in the residual functional capacity assessment: (1) no

decision making required and (2) no changes in the work setting.

Because of these restrictions, Meckley argues there were no jobs

existing which she could perform.  The vocational expert at the

hearing was first asked a hypothetical question relating to a

limited range of light work. The limited range of light work would

have a sit/stand option, occasional climbing, balancing and

stooping but never climbing ladders; never kneeling crouching or

crawling; no bilateral overhead reaching; avoidance of temperature

extremes, humidity, vibration and hazards; and limited to simple,

routine tasks and low stress, defined as no decision making and no

changes in the work setting.  With respect to the limited range of

light work hypothetical question, the vocational expert stated

that Meckley could not perform her past relevant work but that

there would be jobs available such as basic assembly (1200

regionally), packing positions (3100 regionally) and visual

inspector positions (2100 regionally) which she could perform.

Tr. 837-838.  When the hypothetical question was changed to

sedentary work with the same limitations except the sit/stand

option, the vocational expert testified that there still would be
jobs available although there would be a 50% erosion in the job
base.   In other words instead of 1200 assembly positions there
would be 600, instead of 3100 packing position there would be
1550, and instead of 2100 visual inspector positions there would
be 1050. Tr. 838-839 and 857.   In light of the vocational experts
testimony, Meckley's argument relating to the mental limitations
or restriction is without merit.

We will now discuss why this case must be remanded.   In
one paragraph Meckley mentions the sit/stand option and cites
Social Security Ruling 83-12 which states in relevant part as
follows:

> Unskilled types of jobs are particularly structured
> so that a person cannot ordinarily sit or stand at
> will.   In cases of unusual limitation of ability to
> sit or stand, a VS[23] should be consulted to clarify
> the implications for the occupational base.

There is no elaboration by Meckley as to how this provision is
applicable to her case.   However, our review of the questions
posed by the administrative law judge to the vocational expert at
the hearing revealed a defect in the administrative law judge's
decision. Tr. 837-839 and 848.

The burden is on the Commissioner to present evidence
that demonstrates that other work exists in significant numbers
which Meckley can do in light of her residual functional capacity.

---

23.   "VS" is an abbreviation for vocational specialist.

The administrative law judge in her assessment of Meckley's residual functional capacity included a sit/stand option. However, the hypothetical question posed to the vocational expert relating to unskilled sedentary work did not include a sit/stand option. We cannot assume that the numbers and types of jobs (assembler-600, packer-1550 and visual inspector-1050) which the vocational expert testified about were jobs available which Meckley could perform.  The administrative law judge included in her light work hypothetical a sit/stand option but did  not include a sit/stand option in her unskilled sedentary work hypothetical question.  Consequently, the administrative law judge's decision at the fifth step of the sequential evaluation process is not supported by substantial evidence.

NOW, THEREFORE, IT IS ORDERED THAT:

1.   The Clerk of Court shall enter judgment in favor of Joanne M. Meckley and against the Commissioner as set forth in the following paragraph.

2.   The decision of the Commissioner denying Joanne M. Meckley social security disability insurance benefits is vacated and the case remanded to the Commissioner for further proceedings relating to the fifth step of the sequential evaluation process. The Commissioner may clarify the record by way of a new hearing or the presentation of an affidavit from the vocational expert, Kristan Sagliocco.  In either case the Commissioner shall issue a new decision.

3.   The Clerk of Court shall close this case.


                              s/Malcolm Muir
                              MUIR
                              United States District Judge


MM:gs